**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Robert D. POMMERENING and Cletus A. Reding, Defendants-Appellants.**

**Nos. 73–1937, 73–1938.**

United States Court of Appeals, Tenth Circuit.

July 1, 1974.

Rehearing Denied Aug. 5, 1974.

---

Alfred M. Carvajal, Albuquerque, N. M., for defendants-appellants.

Victor R. Ortega, U. S. Atty., Albuquerque, N. M., for plaintiff-appellee.

Before PICKETT, HILL and DOYLE, Circuit Judges.

HILL, Circuit Judge.

Appellants were indicted by a federal grand jury in the State of New Mexico for bribing a government official in violation of 18 U.S.C. § 201(b)(1), and committing perjury before a grand jury of the United States in violation of 18 U.S.C. § 1623(a). Subsequently appellants were convicted by a jury on all counts of the indictment.

The following evidence was adduced at trial. In the fall of 1971 appellants began negotiating with Ford Marketing Corporation for the Dick Russell Ford dealership in Clovis, New Mexico. To purchase this dealership appellants needed to borrow $200,000. Rafael Gomez was therefore taken into the partnership, the apparent purpose being that his minority status would assist them in obtaining a Small Business Administration (SBA) minority loan. It was soon learned, however, that appellants could not qualify for a minority program loan because Gomez' interest in the enterprise was only ten percent.

While seeking this minority loan appellants met Moses L. Sanchez, the minority enterprise representative for SBA in New Mexico. After talking to Sanchez appellants began looking for a bank which would make them a loan guaranteed by the SBA. Ultimately appellants applied with First National Bank of Clovis for the $200,000 loan. The bank officer who processed appellants' application testified that appellants behaved as if they already had approval for this loan from Sanchez. On October 29, after the bank tentatively approved the loan, appellants hand carried the loan papers to the SBA office in Albuquerque.

Appellants out of their own funds paid Ford $25,000 as a down payment for the dealership. On November 1, 1971, Ford turned over operation of the dealership to appellants. Two weeks later, when appellants still had not heard SBA's decision on their loan application, Ford executives began pressing them for the rest of the money.

Sometime prior to November 16, 1971, the following events took place. Sanchez and appellants were discussing SBA loans when the conversation changed to Sanchez' favorite outdoor activities: hunting and fishing. Sanchez mentioned that he was thinking of buying a new Chevrolet four-wheel drive Blazer for his forthcoming elk hunt and was wondering what type of trade-in he could expect on a car he presently owned. A short time later appellant Pommerening asked one of his salesmen to locate a 1972 Chevrolet Blazer with four-wheel drive. Once this was done appellants purchased the Blazer with a corporate check of Dick Russell Ford, Inc. Appellant Reding picked up the Blazer on November 16, 1971, and delivered it to Sanchez at his home in Albuquerque. Sanchez paid no money for the Blazer.

On the day following delivery of the Blazer, Sanchez requested the SBA district director for New Mexico, Clifford Hawley, to expedite appellants' loan application. Hawley immediately dispatched William Glennon, the loan officer assigned to the case, from Albuquerque to Clovis by plane to investigate the loan application. Following Glennon's trip to Clovis, the loan was recommended for approval by Glennon without extensive credit investigation. It was approved by the chief finance officer on December 6, 1971. On January 6, 1972, appellants concluded the Ford dealership purchase.

In August, 1972, Moses Sanchez resigned from his SBA position following the commencement of a bribery investigation into his activities by the United States Attorney's office and the FBI. Shortly after Sanchez' resignation FBI Special Agent Frank Haines visited appellants' Ford dealership, which by now was called Big Country Ford, to trace the 1972 Chevrolet Blazer. Haines asked Pommerening if he could look at records of the Blazer sale, but Pommerening suggested he come back later after the records were found. Because there was no sale Pommerening and Reding, with the assistance of Big Country Ford's bookkeeper, Brian Ballew, prepared a phony invoice reflecting a sale to an "A. Jenkins" for $5,034.05 in cash. This false information was turned over to Haines. Pommerening also told Haines that the Blazer had been ordered by an unknown contractor and delivered to an Albert Jenks or an A. Jenkins for cash. Later Haines received other documents from Pommerening concerning the Blazer sale; all of these furnished copies were false records which had been prepared by Pommerening's daughter-in-law under the direction of Pommerening and Ballew.

On November 20, 1972, Pommerening and Reding appeared before a grand jury in Albuquerque investigating possible bribery violations by Sanchez. They brought with them subpoenaed corporate books and records containing the false pages previously furnished to the FBI. Pommerening and Reding both testified that the Blazer was sold and delivered in Albuquerque by Reding to Albert Jenks for $5,034.05 in cash, and that such sum

went into the corporate treasury. Reding identified a false invoice as being the sale document and Pommerening demonstrated to the grand jury where the money was taken into income in the books. Later Haines returned to Big Country Ford and secured additional documents, including a deposit slip showing that only $269.33 in cash had been deposited in the corporate account at the time of the Blazer transaction.

On January 17, 1973, a new subpoena was served on appellants. That night a fire broke out in the immediate area of the subpoenaed records at Big Country Ford. Clovis firemen extinguished the fire before any records were damaged. The bookkeeper, Ballew, ultimately testified for the government under a grant of immunity. He testified that the fire at Big Country Ford on January 17 was an attempted arson arranged by appellants to destroy the false records. Sanchez had put Pommerening, Reding and Ballew in touch with an arsonist called "Vince". Appellants paid Vince $3,000 for the attempted arson.

On January 21, 1973, Pommerening came to Albuquerque with the subpoenaed records in a corporate automobile. The automobile containing the records was allegedly stolen that night from the basement of an Albuquerque motel. Ballew testified that Pommerening arranged with Sanchez to have the car stolen and the records destroyed. Because the genuine records and original false records were never located, although the automobile was recovered, the government used copies previously obtained by the FBI to prove its case.

Following a lengthy trial appellants were convicted on the bribery and perjury counts. Appellants were sentenced to five years on each count, such sentences to run concurrently. In addition, each appellant was ordered to pay one-half the costs of prosecution.

On appeal numerous grounds for reversal are proffered. The first alleged basis for reversal is that the federal bribery statute, 18 U.S.C. § 201(b), is unconstitutionally vague since men of common intelligence must guess as to its meaning and differ as to its application. Connally v. General Constr. Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926).

Title 18 U.S.C. § 201(b) provides in part:

> Whoever, directly or indirectly, *corruptly* gives, offers or promises anything of *value* to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of *value* to any other person or entity, with intent—
>
> (1) to *influence* any official act;
> . . . . (Emphasis added).

Appellants contend that 18 U.S.C. § 201(b) is unconstitutionally vague because the words "corruptly", "value", and "influence" are not defined; as a result the statute does not inform those subject to it what acts must be avoided. We do not find the ambiguity in § 201(b) which appellants attribute to it. The words "corruptly", "value", and "influence" are applied in their ordinary, everyday sense. It is obvious from reading § 201(b) that Congress intended to prohibit individuals from giving government employees, while they are acting in their official capacity, compensation in return for special favors. Clearly a person of common intelligence would understand from reading § 201(b) that giving compensation to a government official in exchange for preferential treatment is not allowed. The ordinary person would therefore understand that giving a $5,000 automobile to a government official, in exchange for that official's influence in expediting a loan application, constitutes corruptly giving of something of value to influence an official act. *See* United States v. Bishton, 150 U.S.App.D.C. 51, 463 F.2d 887 (1972); United States v. Irwin, 354 F.2d 192 (2d Cir. 1965), cert. den'd, 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966).

■ Appellants next challenge their perjury convictions. It is their position they committed no perjury by testifying before the grand jury from falsified corporate records because it was the United States attorney rather than themselves who "used" the records. Title 18 U.S.C. § 1623(a) prohibits a person from using false records in a grand jury proceeding; since the United States attorney subpoenaed the corporate records, so the argument goes, and appellants merely answered those questions relating to the records which were asked by the United States attorney, appellants did not "use" the books in a manner prohibited by law.[1] We cannot agree with appellants' rather legalistic argument. Even if we accept appellants' definition of "use" as "meaning to employ for the attainment of some purpose or end, to avail one's self of . . . ", 91 C.J.S. Use, at 517, it is clear that appellants altered the corporate records so that under the United States Attorney's examination the records would show no wrongdoing by appellants. When appellants appeared before the grand jury they brought along false records which would cover up their bribery. They relied upon these false documents in answering the United States attorney's questions; we believe such conduct is tantamount to using records before the grand jury in a manner prohibited by law and thus reject appellants' perjury argument.

■ Appellants next challenge the sufficiency of the indictment. They argue the bribery count does not state with sufficient certainty the essential elements of the crime so that appellants know what they are charged with; thus appellants could not adequately prepare their defense. We disagree; the bribery count specifies appellants as giving the bribe, Sanchez as receiving the bribe, the SBA as employing Sanchez, the 1972 Chevrolet Blazer as the thing of value given, the cost of the Blazer as approximately $5,000, the $200,000 loan involved in the bribe, and the influencing of an official act as the reason for the bribe. The indictment follows closely 18 U.S.C. § 201(b) and is correct, specific and sufficiently detailed to enable appellants to adequately prepare their defense. *See* Stephens v. United States, 347 F.2d 722 (5th Cir. 1965), cert. den'd, 382 U.S. 932, 86 S.Ct. 324, 15 L. Ed.2d 343.

■■ Appellants also attack the sufficiency of the perjury counts because the allegations state that appellants gave Moses Sanchez a bribe in exchange for Sanchez' *assistance* in violation of 18 U. S.C. § 201. Under 18 U.S.C. § 201, there is no crime unless the gift is with the *intent to influence an official act*. Assistance from a public official, appellants suggest, is not the same as "influencing" an official act. Since perjury is defined as a false "material" declaration, appellants could have answered the questions falsely and still not be guilty of perjury because their answers were not material to the crime of bribery. Their answers may have been material to eliciting assistance from Sanchez, but not to the crime of influencing an official act. We believe the government correctly answers this argument when it states that materiality of false declarations is sufficiently charged if the facts alleged show such statements were material. LaSalle v. United States, 155 F.2d 452 (10th Cir. 1946). The facts show unequivocally that appellants' false statements were material to the crime charged, and hence the perjury charges are sufficiently alleged.

Appellants' most plausible argument is that all counts should be dismissed because they are based on evidence unlawfully obtained. Specifically, FBI Agent Harris took documents from appellants without advising them of their constitu-

---

[1] 18 U.S.C. § 1623(a) Whoever under oath in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined not more than $10,000 or imprisoned not more than five years or both.

tional privileges as mandated in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Secondly, appellants were not advised of their constitutional rights prior to their grand jury testimony. The result was that both the documents and grand jury testimony were used to convict appellants of the bribery and perjury charges. Appellants' position is that by the time the grand jury convened they were virtual defendants; obviously the United States attorney was looking for the briber as well as the bribee. Consequently appellants were subjected to an unreasonable search and seizure as prohibited by the Fourth Amendment and were forced to incriminate themselves which is prohibited by the Fifth Amendment.

█ Without deciding whether appellants had standing to assert constitutional rights relating to production of corporate records, we still find appellants' argument to be without merit. At this point a review of the record is necessary. The government's initial investigation, which began in August, 1971, did not involve appellants but rather centered around the bribery activities of Sanchez, minority enterprise representative of the SBA in New Mexico. Pursuant to this investigation, Haines checked with appellants on September 22, 1972, to obtain information on the 1972 Blazer automobile Sanchez was driving. Appellants responded to Haines' request to look at the sale documents by supplying him with a false invoice reflecting a sale to an "A. Jenkins". Appellant Reding told Haines the Blazer had been ordered by an unknown contractor and had been delivered to an A. Jenkins. On several other occasions appellants supplied Haines with false documents. On November 20, 1972, appellants told the grand jury essentially what they told Haines. The government attorney then permitted appellants to leave with their records without having them impounded. The investigation to locate the unknown contractor continued until January 3, 1973, when Haines discovered through other witnesses that false documents had been used.

█ Appellants' principal argument is that by the time a grand jury was convened they were prime targets of the investigation. As a result they were virtual defendants who were entitled to their constitutional rights. We disagree; the evidence is very clear that when the grand jury was convened in November, 1972, Sanchez was the person being investigated. The United States attorney felt appellants could give the grand jury information which would be useful in making a case against Sanchez. While appellants could have claimed privilege against self-incrimination when asked questions which demanded an incriminatory answer if answered truthfully, the government had no duty to warn appellants of their constitutional rights in absence of any indication that it might bring charges against them. Robinson v. United States, 401 F.2d 248 (9th Cir. 1968). Appellants through fraud and deception led the government down a blind path for months and at the time of the grand jury investigation the government was still searching for "A. Jenks", as the briber. Appellants were called as witnesses to testify about "A. Jenks'" connection with the Chevrolet Blazer transaction, but they were not at that time suspects. They were grand jury witnesses and as such were not entitled to warnings of their right to remain silent and right to counsel. United States v. DiMichele, 375 F.2d 959 (3d Cir. 1967), cert. den'd, 389 U.S. 838, 88 S.Ct. 54, 19 L.Ed.2d 100. Besides, at that time appellants were not under duress or compulsion which might constitute custodial interrogation, hence they were not entitled to Miranda warnings. United States v. Morado, 454 F.2d 167 (5th Cir. 1972), cert. den'd, 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116; *see* United States v. Davis, 456 F.2d 1192 (10th Cir. 1972).

█ Appellants also suggest that failure to give them a Miranda warning

bars their perjury prosecution for false testimony before the grand jury. The law is well settled, however, that even if appellants were entitled to a Miranda warning, failure to give the warning does not entitle them to commit perjury. Our legal system provides other methods for challenging the government's right to ask questions. Bryson v. United States, 396 U.S. 64, 90 S.Ct. 355, 24 L. Ed.2d 264 (1969); *see* Cargill v. United States, 381 F.2d 849 (10th Cir. 1967), cert. den'd, 389 U.S. 1041, 88 S.Ct. 781, 19 L.Ed.2d 831 (1968); United States v. Winter, 348 F.2d 204 (2d Cir. 1965), cert. den'd, 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360.

█ Appellants contend prejudicial error was committed when they were prohibited from cross-examining Ballew in connection with his apparent alcoholic and drug problems. As we have pointed out on another occasion, however, cross-examination should be limited to subjects which are relevant to the issues. Examination of "collateral matters rests largely within the discretion of the trial court, and its ruling will not be disputed unless it appears that there has been a clear abuse of this discretion and an injustice done." Marteney v. United States, 218 F.2d 258, 265 (10th Cir. 1954), cert. den'd, 348 U.S. 953, 75 S.Ct. 442, 99 L.Ed. 745 (1955). We find no abuse of discretion. Appellants intended to ask questions relating to specific acts occurring anywhere from four years to six months before the bribery. They were unable to show, however, that at any time pertinent to this case Ballew was suffering from the effects of alcoholism or drug addiction. Under these circumstances we do not believe the trial court's refusal to allow this line of questioning constitutes an injustice warranting reversal.

█ Error also allegedly resulted when the trial court denied appellants' requested instructions pertaining to essential elements of the crime of perjury. Specifically, appellants contend they were entitled to a perjury instruction relating to giving of incorrect testimony because of "surprise, confusion, haste, inadvertence, honest mistake as to facts, carelessness, or negligence"; secondly, an instruction should have been given to the effect that a defendant cannot be found guilty of perjury "if a question is vague or ambiguous when asked and evokes an untrue answer born of misunderstanding." While appellants are entitled to have presented instructions relating to their theory of defense for which there is any foundation in the evidence, United States v. Hagen, 470 F.2d 110 (10th Cir. 1972), cert. den'd 412 U. S. 905, 93 S.Ct. 2291, 36 L.Ed.2d 970, it is clear that in the present case there is no evidence to reasonably support appellants' proffered instructions. There is absolutely no evidence that appellants made incorrect statements to the grand jury because of misunderstanding, surprise, confusion, haste, and so forth. In fact, the evidence shows conclusively that appellants set out to perpetrate a deliberate fraud upon the grand jury. We believe the trial court was correct in denying these instructions.

█ The next alleged basis for error is that the government should not have been permitted to bring out the fact that appellants submitted false financial statements in regard to their application for an SBA guaranteed bank loan. In particular, the government should not have been allowed to raise the issue of appellants' prior bankruptcies because it tended to show appellants' bad character and tendency toward the perjury charge. Since appellants did not testify their character was never placed in issue, hence the government was precluded from making it an issue. The evidence abundantly demonstrates, however, that appellants' false financial statements and bankruptcies were offered to establish the necessity and motive for the bribe. That is, through bribery appellants gained speedy approval of their loan application without being subjected to a thorough background check. They received a favorable response which most likely would not have been forthcoming had the SBA or Ford

Marketing Corporation known of their prior voluntary bankruptcies. The general rule is that evidence of unconventional conduct is admissible if material to the crime charged. Welch v. United States, 371 F.2d 287 (10th Cir. 1966), cert. den'd, 385 U.S. 957, 87 S.Ct. 395, 17 L.Ed.2d 303. Unquestionably evidence of the false financial statements and appellants' bankruptcies is material since it establishes the circumstances and motive for the bribe.

Appellants charge the trial court with error in failing to inform them of its proposed action upon requested instructions prior to counsel's arguments to the jury. Rule 30, F.R. Crim.P., states in part that "[t]he Court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury . . . . " Appellants suggest this rule is mandatory and failure to strictly adhere to it is grounds for reversal. The reasoning behind this, appellants argue, is to assure that counsel may intelligently argue their case to the jury. The same argument was proffered in Whitlock v. United States, 429 F.2d 942 (10th Cir. 1970), and we held that the trial court's procedure would not constitute reversible error unless the party "was unduly and unfairly prevented from making his argument to the jury or was substantially misled by the court's actions or inaction in formulating his arguments." *Whitlock*, at 946. In the case before us, no objection to the procedure was made during the course of the trial and appellants do not allege they were misled by the court's action. They cite no specific prejudice and we discover none in the record; thus we find no reversible error.

After a guilty verdict was returned the court ordered appellants to pay certain costs of prosecution; the total cost for each appellant was $6,948.33. Appellants challenge the court's authority to assess costs against them for: (1) witnesses who did not testify in the case; (2) the marshal's per diem expenses and costs of boarding prisoner witnesses; (3) expenses of government agents who testified only to the reproductions of copies of exhibits; and (4) stenographic transcript expenses of grand jury testimony and expenses incurred in copying grand jury testimony furnished appellants under Jencks Act demand.

Appellants first challenge the court's authority to assess costs against them for witnesses who did not testify in the case. Generally speaking costs in criminal prosecutions are dependent wholly upon statutory provisions. 20 Am.Jur.2d, Costs, § 100, at 79. If a statute does not expressly allow the taxing of costs against a defendant for witnesses who did not testify there is no judicial authority for doing so. In disposing of this issue we must therefore look to 28 U.S.C. § 1918(b), which states that "[w]henever any conviction for any offense not capital is obtained in a district court, the court may order that the defendant pay the costs of prosecution." The judicial rule developed pursuant to 28 U.S.C. § 1918(b) and its predecessors is that the taxing of costs in a criminal case is discretionary with the district court. United States v. Lee, 107 F.2d 522 (7th Cir. 1939), cert. den'd, 309 U.S. 659, 60 S.Ct. 513, 84 L.Ed. 1008; United States v. Bodine Produce Co., 206 F. Supp. 201 (D.Ariz.1962). This general rule is tempered, however, by the requirement that when witnesses are subpoenaed, but do not testify, it will be presumed that their testimony is not material and that they were unnecessarily brought to court. Thus, in the absence of equitable reasons, the costs of such witnesses should not be charged against the losing party. United States v. Lee, *supra*; United States v. Miller, 223 F. 183 (S.D.Ga.1915). In the present case the government submitted a Bill of Costs to the court and appellants filed their objections to the cost bill. The court, without holding a hearing to consider the equities of the cost bill, assessed costs against appellants for witnesses who did not testify at trial. We believe a hearing should be held on the

question so the government can present its case supporting the taxing of costs against appellants. If the court concludes the nontestifying witnesses' testimony was not material or no equitable reasons exist for assessing costs to appellants, then the government's cost bill on this subject should be denied.

 The next contention is that charging appellants for the marshal's $400 per diem expenses and $408 lodging expenses for two prisoner witnesses is not authorized by statute. We agree. Title 28 U.S.C. § 1921 enumerates the charges of marshals that may be taxed as costs. Sums expended for per diem expenses and prisoners' lodging do not come within this provision. These sums should be regarded as expenses of administration of justice assessed by the United States. United States ex rel. Griffin v. McMann, 310 F.Supp. 72 (E. D.N.Y.1970). The government replies, however, that 28 U.S.C. § 1920(3) is broad enough to provide for the marshal's actual expenses in bringing imprisoned witnesses to trial, since it reads:

A judge or clerk of any court of the United States may tax as costs the following: . . .

(3) Fees and disbursements for printing and witnesses.

The government suggests that under 28 U.S.C. § 567 the marshal is authorized expenses for transporting prisoners, subsistence and so forth. Since no fee or travel expense is disbursed to the prisoners, the government's expense in getting them to trial is the "disbursement" authorized by § 1920(3). We cannot accept this reasoning. Statutes relating to taxable costs are to a degree penal in character. As a result, they must be strictly construed and items to be taxed must be within the express language of the statute. *See* Braun v. Hassenstein Steel Co., 23 F.R.D. 163 (D.S.

D.1959). We do not find, upon reading § 1920(3), where per diem expenses for marshals and lodging expenses for prisoners are authorized in criminal cases.

 The next objection concerns the taxing of costs for the travel and subsistence of two FBI agents sent down from Washington, D. C., to authenticate blown-up photographs of records used by the government in its case against appellants. Only one of the agents testified. With respect to the testifying agent it appears his testimony was relevant and thus we cannot say the court abused its discretion in allowing as part of the taxable costs the agent's travel and subsistence expenses. Whether the nontestifying agent's testimony is material, thereby warranting the assessment of his costs against appellants, can be determined at the hearing.

 Error is alleged in allowing costs for the stenographic transcript of grand jury testimony of witnesses not testifying at trial; also in allowing costs to be assessed against appellants for copies of the grand jury testimony furnished them under Jenck's Act demand. We believe the trial court's taxing of costs in this area was not an abuse of discretion. Under 28 U.S.C. § 1920(2) costs of stenographic transcripts obtained for use in the case may be charged to the losing party. The transcripts were properly obtained for use in the case and hence their costs may be taxed to appellants.

Numerous other grounds for reversal are raised by appellants, but we find these to be totally without merit.

The conviction in each case is affirmed, but that portion of the controversy in each case pertaining to the assessment of costs is remanded with directions to the trial judge to conduct an evidentiary hearing and make appropriate findings and conclusions in accordance herewith.