337 A.2d 288

COMMONWEALTH of Pennsylvania

v.

**Irvin L. GOOD and Louis Maio,
Appellants (two cases).**

Supreme Court of Pennsylvania.

Argued Dec. 5, 1974.

Decided April 17, 1975.

Rehearing Denied May 28, 1975.

Jackson M. Sigmon, Sigmon, Littner & Ross, P.C., Bethlehem, for Irvin L. Good, appellant.

Mark S. Refowich, Fishbone & Refowich, P. C., Herbert Fishbone, Easton, for Louis Malo.

Charles H. Spaziani, Dist. Atty., Easton, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

POMEROY, Justice.

We are asked in these two appeals to reverse convictions of perjury on the ground that the perjurious statements were made by defendants when they testified before a grand jury without first being warned of certain aspects of their right against self-incrimination. We hold that the failure to give such warnings did not vitiate the prosecution of these appellants.

In April 1967, a special investigating grand jury was convened in Northampton County to inquire into alleged gambling activities within the county and any related po-

lice misconduct. Among those called to testify before the grand jury were Irvin L. Good and Louis Maio, the appellants. At the time they were summoned to appear, Maio was a member of the police force of the City of Bethlehem and Good was the Director of Public Safety of the City. Both men testified and denied any knowledge of any illegal wiretapping activities by members of the Bethlehem police department. This testimony, however, was directly contrary to information Maio had previously given the district attorney of Northampton County. In fact, prior to his grand jury appearance Maio had personally played for the district attorney certain tape recordings which he had made as a result of illegal wiretapping during 1962 and 1963 and which, he told the district attorney, had been undertaken at the express behest of his superior, Director Good.

Following their grand jury appearances Maio and Good were indicted for perjury. They moved to quash the indictments on the ground that prior to testifying before the grand jury, the appellants had not been adequately advised of their rights relative to their Fifth Amendment privilege against self-incrimination as set forth in *Commonwealth v. McCloskey,* 443 Pa. 117, 277 A.2d 764 (1971), cert. denied, 404 U.S. 1000, 92 S.Ct. 559, 30 L.Ed.2d 552 (1971). Following the denial of these motions and the granting of Good's motion for severance, appellants were tried separately and each was convicted of perjury. On appeals from the judgments of sentence, the Superior Court affirmed. *Commonwealth v. Good,* 225 Pa.Super. 719, 306 A.2d 367 (1973). This Court then granted allocatur in each case,[1] limited to two questions: (1) whether the failure to give appellants the warnings as prescribed in *Commonwealth v. McCloskey, supra,* precluded conviction of perjury before the grand jury; and (2) whether, if so, the decision in *McCloskey,*

---

1. Our orders granting allocatur directed that the two appeals in this Court should be consolidated.

which was announced subsequent to the grand jury proceeding here involved, should be applied retrospectively.[2]

In *Commonwealth v. McCloskey, supra,* we held, *inter alia,* that an individual appearing before a grand jury as a witness must first be advised of his right to consult with a lawyer both before and after his testimony, but not while testifying; further that if he has any doubt as to whether he make invoke his Fifth Amendment privilege not to be a witness against himself, a witness must be told that before answering a particular question he may come with his counsel before the court supervising the grand jury to obtain a ruling as to whether he may refuse to answer that question. 443 Pa. at 143, 277 A.2d at 777.[3] In fashioning the remedy for a failure of the supervising court to give such instructions, we further held that "those indictments in any way based upon a defendant's own testimony given without this warning and in violation of his right against self-incrimination must be quashed." *Id.* at 120, 277 A.2d at 766.

The question whether indictments for perjured grand jury testimony were intended to be included within the *McCloskey* proscription of indictments based on self-in-

**2.** In light of our disposition of the first question, we do not reach the question of retroactive application of the *McCloskey* rule. But see *Commonwealth v. L. E. Wilson Co., Inc.,* —— Pa. ——, ——, n. 1, 328 A.2d 502, 504, n. 1 (1974).

**3.** We have recently declined to extend *McCloskey* so as to require the supervising judge to inform prospective grand jury witnesses of the full panoply of constitutional rights delineated by the Supreme Court of the United States in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Commonwealth v. Columbia Investment Corp.,* 457 Pa. 353, 325 A.2d 289 (1974). We there held, *inter alia,* that such witnesses are not entitled to be warned of *Miranda* rights because the witnesses are not then subject to "in-custody" police interrogation, the time when the *Miranda* rights attach. 457 Pa. at 360, 325 A.2d at 293. Therefore, insofar as these appellants also claim entitlement to such warnings (a claim which is outside the scope of the order granting allocatur), that claim must fail. But see *United States v. Mandujano,* 496 F.2d 1050 (5th Cir. 1974), cert. granted, 420 U. S. 989, 95 S.Ct. 1422, 43 L.Ed.2d 669 (1975).

criminating testimony was not directly addressed in that case itself. Our opinion did, however, intimate that such indictments were not to be quashed simply because the warnings required by our decision were not given by quoting with approval from the decision of the New York Court of Appeals in the case of *People v. Ianniello*, 21 N.Y.2d 418, 288 N.Y.S.2d 462, 235 N.E.2d 439, cert. denied, 393 U.S. 827, 89 S.Ct. 90, 21 L.Ed.2d 98 (1968). In discussing that case, we observed that the court there had "noted that if a witness is told he cannot see his lawyer, '. . . he does not have license to commit perjury or contempt. Rather, he must persist in his refusal to answer, thus forcing the prosecutor to take the matter into open court for a ruling.'" 443 Pa. at 144, 277 A.2d at 778. We are now satisfied that this intimation pointed in the right direction, and that perjury is not within the protection of the remedial ban announced in *McCloskey*.

The Supreme Court of the United States has had occasion to consider similar, although not identical, attempts to expand the protection of the privilege against self-incrimination so as to escape the consequences of false statements. In the case of *United States v. Knox*, 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969), that Court refused to allow the privilege to be interposed as a defense to a federal prosecution for making false statements on a federal wagering tax return. This holding was in contradistinction to the Supreme Court's decisions in the companion cases of *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) and *Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968). In those cases, the Court had held that the Fifth Amendment privilege could be asserted as a valid defense to prosecutions for failing to comply with certain provisions of the federal tax laws pertaining to wagering transactions, the same provisions involved in *Knox*.

For the Court, the crucial difference between the *Grosso* and *Marchetti* situation, on the one hand, and the situation in *Knox*, on the other, was that in the former, the defendants had refused to comply with the provisions when to do so would be incriminating, whereas in the latter the defendant purportedly complied with the provisions, but in doing so supplied information which was false. In making this distinction, the Court followed the principle which it had established in *Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966) and reaffirmed in *Bryson v. United States*, 396 U.S. 64, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969), "that one who furnishes false information to the Government in feigned compliance with a statutory requirement cannot defend against prosecution for his fraud by challenging the validity of the requirement itself." 396 U.S. at 79, 90 S.Ct. at 365, 24 L.Ed.2d at 279. The Court in *Knox* concluded that by supplying false information, "[h]e has taken a course other than the one that the statute was designed to compel, *a course that the Fifth Amendment gave him no privilege to take.* . . . [W]hen Knox responded to the pressure under which he found himself by communicating false information, this was simply not testimonial compulsion." *Id.* 396 U.S. at 82, 90 S.Ct. at 367, 24 L.Ed.2d at 280 (emphasis added).

We believe that the appellants in this case have also taken a course which is outside the umbrella of the privilege against self-incrimination. They attempt to portray their position before the grand jury as completely untenable in that all of the options open to them while testifying were fraught with difficulties. As appellants view them, their three options were (1) to refuse to testify and thereby be subject to contempt citations; (2) to confess to substantive violations of the wiretapping statutes and thereby incriminate themselves; or (3) to deny any wrongdoing, and thus to commit perjury. This uncomfortable predicament has been aptly referred to as "the

three horns of the triceratops"—contempt, harmful disclosure and perjury. 8 J. Wigmore, Evidence, § 2251 at 316 (McNaughton rev., 1961).

There is no doubt that this trilemma existed for appellants, as it must for many witnesses every day. When, however, a witness chooses to resolve that conflict by lying under oath, the perjury cannot be permitted to go unpunished. In a similar context, the Court of Appeals for the Tenth Circuit reached the same result in the recent case of *United States v. Pommerening*, 500 F.2d 92 (10th Cir. 1974). There, the issue was whether the failure to give prospective grand jury witnesses *Miranda* warnings barred their subsequent prosecution for perjurious testimony before the grand jury. Without directly passing on the question whether in fact such witnesses were entitled to those warnings, the court held: "The law is well settled, however, that even if appellants were entitled to a *Miranda* warning, failure to give the warning does not entitle them to commit perjury. Our legal system provides other methods for challenging the government's right to ask questions." 500 F.2d at 100, citing *Bryson v. United States, supra; Cargill v. United States,* 381 F.2d 849 (10th Cir. 1967), cert. denied, 389 U.S. 1041, 88 S.Ct. 781, 19 L.Ed.2d 831 (1968); *United States v. Winter,* 348 F.2d 204 (2d Cir. 1965), cert. denied, 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965). See also *United States v. Andrews,* 370 F.Supp. 365 (D. Conn.1974); *United States v. Sweig,* 316 F.Supp. 1148 (S.D.N.Y.1970), aff'd 441 F.2d 114 (2d Cir. 1971), cert. denied, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971).

We are persuaded that the same considerations must apply in the cases before us. The failure to give Maio and Good, prior to their testimony before the grand jury, the warnings later prescribed in *McCloskey* did not require that their indictments for perjuring themselves before the grand jury be quashed. If they did not wish to

tell the truth, appellants could have grasped the first horn of the trilemma by refusing, on the grounds of self-incrimination, to answer the questions posed to them concerning their illegal wiretapping activities, and could likewise have defended against any subsequent contempt citation for such refusal to answer. Since this avenue was available to appellants, it was incumbent upon them to pursue it. Instead, they opted for perjury. Neither Maio nor Good can now be heard to complain that he was "compelled . . . to be a witness against himself." Constitution of the United States, Amendment V.

In closing, we emphasize that our present holding is in no way intended to downgrade the importance of the *McCloskey* warnings. The problem to which the relevant portion of our decision in that case was particularly directed was that "[d]etermining what is an incriminating statement is not always clear to a layman." 443 Pa. at 144, 277 A.2d at 778. That difficulty is hardly a concern when a witness deliberately swears falsely; he is bound to know that such testimony is a crime, and that to commit it will subject him to the sanctions of the criminal law.[4]

Orders affirmed.

EAGEN, J., concurs in the result.

NIX, J., filed a concurring opinion.

NIX, Justice (concurring).

I fully agree with the majority's view that the law may never countenance the election of an illegal option to avoid a dilemma even where the dilemma was improperly created. Thus a witness may not be permitted to avoid punishment for perjury although he was improperly required to testify. Regardless how reprehensible the gov-

---

4. Indeed, appellant Maio during his testimony before the grand jury was specifically advised by the district attorney who was questioning him that perjury was a felony.

ernmental coercion may be, the condition cannot be remedied by condoning equally reprehensible conduct on the part of defendants, i. e., perjury.

Additionally, I wish to again note my disagreement generally with the quality and quantum of protections the majority of this Court has seen fit to give a witness who appears before investigative grand juries where that witness is a potential defendant. See *Commonwealth v. Columbia Investment Corporation*, 457 Pa. 353, 373, 325 A.2d 289, 299–303 (1974) (Dissenting Opinion, Nix, J.).

MANDERINO, J., filed a dissenting opinion.

MANDERINO, Justice (dissenting).

I dissent. The majority describes three options as being open to the appellants when called to testify before the grand jury: (1) to act in a contemptuous manner, (2) to make harmful disclosures, and (3) to commit perjury. There is, however, a fourth option: exercise of the constitutional right against self-incrimination. But nobody told these appellants about their constitutional rights. The majority says that the appellants could have invoked their constitutional rights, and since "this avenue was available" the appellants should have pursued it. How could they? The very point of the appellants' appeal is that one compelled to talk by government coercion is entitled to be informed of his constitutional rights. The majority fails to answer the only issue raised—why are citizens not entitled to be informed of their constitutional rights when compelled to testify? It would be simple, painless, and relatively costless to tell people of their constitutional rights. Why not do it? I must dissent.